

**The following constitutes the ruling of the court and has the force and effect therein described.**

**United States Bankruptcy Judge**

**Signed August 17, 2011**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| AHF DEVELOPMENT, LTD., | § | CASE NO. 09-20703-RLJ-11 |
| | § | |
| DEBTOR | § | |

### MEMORANDUM OPINION

The Court must determine whether to dismiss this bankruptcy case or, alternatively, to substantively consolidate it with the affiliated case of American Housing Foundation (AHF) (case no. 09-20232-11). Dismissal is sought by the United States Trustee (the UST) and joined by Attebury Family Partnership, L.P. (Attebury) and the 2001 Scott D. Rice Trust (the Rice Trust).[1]

Opposing dismissal and moving to substantively consolidate this case with the AHF case are, initially, the Official Unsecured Creditors Committee of AHF (the AHF Committee), AHF (as

---

[1] The motion to dismiss is also joined by the Unsecured Creditors Committee of the debtor here, AHF Development, Ltd. The Committee is represented by the same counsel that also represents Attebury.

then debtor-in-possession), and certain investors/creditors.[2] Such parties were later joined by

Walter O'Cheskey, the Chapter 11 Trustee of AHF (O'Cheskey). The parties seeking dismissal

obviously oppose consolidation. Trial on this matter was held March 4, 2011.

## BACKGROUND

### A.

The UST began this dispute by moving to dismiss this bankruptcy case because the debtor,

AHF Development, Ltd. (Development), had not, since its filing, looked or acted like a Chapter

11 debtor. It had no ongoing business operations, in fact no activity at all; it was not filing the

required monthly operating reports; and it apparently had not been filing tax returns. It had (and

still has) nothing to reorganize. In addition, its only claimed asset is an alleged $16 million

receivable due from AHF, which is also its general partner. The parties are well aware of AHF.

AHF is an asserted non-profit entity with an evolving history with the Court.  For purposes of the

issues before the Court here, the Court would add that AHF, as the general partner of

Development, caused the Chapter 11 filing of Development.

The AHF Committee opposed the UST's motion. The AHF Committee's response, in

part, echoes the UST's allegations: Development is essentially a non-entity, with no employees,

no ongoing business operations, and—save for the $16 million receivable claim made against

AHF—no assets. The AHF Committee's response goes further, however. It asserts that

---

[2]Such investors/creditors are C.C. Burgess; Campbell Burgess; Carson Herring Burgess; Carson Burgess, Inc.; the Burgess Trust No. 4; Chain-C, Inc.; Kevin Clark; Charlotte Burgess Griffiths; Herring Bank; Herring Financial Services; Jessie Herring Johnson Estate Trust No. 1; Jessie Herring Johnson Estate Trust No. 2; the Frances E. Maddox Foundation; the Cornelia J. Slemp Trust; the Louise Johnson Thomas Trust; Vaudrey Capital; Dennis Dougherty; Heron Land Company; Terrill J. Horton; Paul King; the Estate of Frances Maddox; Matt Malouf; David Miller; Susan Solomon Miller; William E. Scott; William E. Scott IRA; the Storseth Family Trust; Clay Storseth; and Robert L. Templeton.

Development was the alter ego of Steve Sterquell, the deceased (allegedly by suicide) head of

AHF, and was "always an alter ego of AHF." AHF Committee's Objection to Motion to Dismiss

¶ 8. Development, according to the AHF Committee, was the recipient of "misappropriated

fiduciary funds," which were, in turn, improperly used by AHF for its expenses. Such fiduciary

funds were therefore twice misappropriated, apparently. *Id*. ¶ 11.

The AHF Committee's allegations go further still. After cataloging various misdeeds of

Steve Sterquell and his use of AHF and Development in carrying out his activities, the AHF

Committee gets to the real reason for opposing the UST's motion and wanting, instead, a

consolidation of the two cases. Their real concern is that Attebury, an undisputed creditor of both

Development and AHF, and perhaps a few other creditors of Development, may "gain a

preference in the AHF bankruptcy by executing on the . . . Development claim in the AHF

bankruptcy for pennies on the dollar. If the . . . Development claim . . . [is] allowed in the AHF

bankruptcy, these creditors might in fact obtain a very substantial additional payment from the

bankruptcy court in preference to other AHF creditors." *Id*. ¶ 12. In effect, the AHF Committee is

concerned that Attebury and a few others will recover a portion of the $16 million receivable that

is allegedly owed by AHF to Development.

AHF joined in the motion for substantive consolidation filed by the AHF Committee,

alleging as follows:

> AHF Development consisted chiefly of a bank account used by Steve Sterquell as a
> clearinghouse for funds taken from various entities related to American Housing
> Foundation, as well as investors who believed that they were investing in such entities,
> and used for various purposes not related to such entities or investments, including
> the payment of liabilities for which American Housing Foundation was liable and the
> collateralization of loans guaranteed by American Housing Foundation. For all intents
> and purposes, Sterquell used the AHF Development account, as he used the assets of

American Housing Foundation, to further his own objectives for himself and for American Housing Foundation. AHF Development, Ltd. essentially did no business and had no assets other than the bank account, which, for all intents and purposes, was treated by Sterquell as another bank account of American Housing Foundation. Sterquell thereby disregarded the distinction between the two entities.

. . .

Further, in order to offset the funds taken from properties, investors, and other sources, Sterquell created on AHF Development's books a receivable from American Housing Foundation in the amount of $16,080,449.00. American Housing Foundation disputes the validity of this receivable, and one reason for the filing of AHF Development, Ltd.'s bankruptcy case was to prevent certain creditors of American Housing Foundation from obtaining a judgment against AHF Development, Ltd., executing on the receivable, and then filing a claim in the American Housing Foundation bankruptcy case based on the receivable that, if allowed, could result in a preferential distribution to such creditor far in excess of the pro rata amounts distributed to other unsecured creditors at the time of such distribution. Substantive consolidation of the two cases would extinguish the invalid $16 million receivable and, in addition, would avoid the need to reconcile significant claims that exist between the two entities.

AHF Joinder, ¶ 3-4. The investor/creditor group, represented by the firm of Lovell, Lovell, Newsom & Isern, L.L.P. (the Lovell Firm), filed their motion for substantive consolidation, which merely mimics the AHF Committee's motion. Finally, on or about December 20, 2010, O'Cheskey joined the fun, also wanting Development, the non-debtor debtor, consolidated with AHF. O'Cheskey simply incorporated by reference the arguments made by the preceding motions for substantive consolidation. O'Cheskey's prayer for relief gets right to the point:

[T]he Chapter 11 Trustee . . . requests the Court to exercise its equitable powers to substantively consolidate the bankruptcy estates of American Housing Foundation and AHF Development, Ltd. for all purposes and that (i) **the date of the filing of the involuntary bankruptcy petition of AHF (April 21, 2009) be deemed the date of filing of the bankruptcy petition of [Development] for all purposes, including but not limited to avoidance actions**; (ii) all intercompany claims by and between AHF and [Development] be extinguished; (iii) all assets and liabilities of each of AHF and [Development] be merged or treated as if they were merged with the assets and liabilities of AHF; (iv) any obligation of either of AHF or [Development] and all guarantees by one or both of them be deemed to be an obligation of AHF; (v) each claim filed against [Development] be deemed filed against the bankruptcy estate of

- 4 -

> AHF and be deemed a single claim against and a single obligation of AHF; and (vi) all claims based upon guarantees of collection, payment or performance made by both AHF and [Development] as to the obligations of the other be released and of no further force or effect.

O'Cheskey's Joinder, p. 2 (emphasis added).

The other major players in this dispute are Attebury and the Rice Trust. Attebury favors dismissal and opposes consolidation as he wants to maintain his claims against both AHF and Development and preserve Development's claims against AHF. The Rice Trust, like Attebury, asserts a claim against Development. The Rice Trust favors the UST's motion seeking dismissal and reiterates the various reasons why the case should be dismissed. Its main concern, however, is with the potential back-dating of the Development bankruptcy filing to the date of the involuntary petition of AHF (April 21, 2009) and the effect this may have on the Rice Trust's transactions with Development and/or AHF. They therefore request that in the event the Court does consolidate the cases, the consolidation have no effect on Development's actual filing date of October 19, 2009.

**B.**

Despite the differences of opinion as to what should be done with Development's bankruptcy case, there is no dispute concerning the facts that support the UST's dismissal motion. In fact, the parties entered into stipulated facts. The relevant facts are set forth as follows.

Development is a limited partnership which filed its voluntary Chapter 11 petition on October 19, 2009. The petition was signed by Alvin Johnson as Vice President of AHF, the general partner. Tom Boyd, a Texas attorney and then the attorney for AHF, filed the petition as attorney for Development. Boyd did not pursue an application to be employed as attorney for

- 5 -

Development, however. As a result, Development has no attorney to represent it in its Chapter 11 case, nor does it have any representative to appear on its behalf. AHF paid both the filing fee for Development and attorney's fees to Tom Boyd of $3,000 in connection with Development's filing.

Development's first monthly operating report, due December 20, 2009, was not filed; in fact, Development has never filed a monthly operating report during the pendency of this Chapter 11 case. It has also never paid a quarterly filing fee to the UST. Development has not filed its 2008 or 2009 tax returns, and there is no likelihood that any of these omissions will be cured. Development has no business to reorganize, and it is engaged in no activity whatsoever. There is no corporate or partnership resolution authorizing Development's bankruptcy filing, and Development never mailed notice of the filing of bankruptcy or notice of the meeting of creditors to anyone. Development has not established a debtor-in-possession bank account and has no known business purpose.

Development has no employees and there is no reasonable likelihood that Development will file a plan of reorganization, much less obtain confirmation of a plan. Despite the concern over Development's supposed $16 million claim against AHF, AHF actually filed a proof of claim for $16,000,000.00 in Development's case. The claim has no supporting documentation; it is signed by Charles White, the attorney then acting for both AHF and Development. No objection has been filed to this claim. A claim was later filed by Development in the AHF case for $16,080,449.00. It, too, has no supporting documentation and states it is for "[m]oney owed"; it was signed and filed by John Sims who also represents Attebury. O'Cheskey has objected to the claim filed by Development.

Development's limited partnership agreement, which caused the formation of Development, is "subject to interpretation as to whether [Development] dissolved upon the bankruptcy of AHF, [Development]'s sole general partner." Stipulations of the Parties [doc #70]. In addition, Development's limited partnership agreement reflects that Development was formed on September 9, 1998, and that AHF owns 2% of Development as general partner.[3] Catherine Koehler, Catherine D. Koehler Trust, Mary Schooler, and Mary Catherine Schooler Trust each own 24.5% as limited partners. Catherine Koehler and Mary Schooler have also filed bankruptcy, case nos. 09-20648-7 and 09-20261-11, respectively. The stated purpose of the partnership is to "acquire, hold, sell, dispose of and otherwise deal with multifamily residential developments." Trustee's Exhibit 2 (containing the 1998 Development partnership agreement and the 2002 amended partnership agreement).

The evidence at trial further established that Development did have a bank account, the signatories of which were all AHF employees. The account was closed in March of 2009, several months prior to the bankruptcy filing. Development also had a set of books, QuickBooks or Excel spreadsheet, that were maintained by Michelle Abdoo, an employee of AHF. The entities engaged in unusual accounting practices. Development filed a tax return in 2006, but such return reflects no income. It had partial financial statements or a partial general ledger for 2006 which do not match the tax return for that year.

There is no dispute that Attebury made a loan to Development in the amount of $3,000,000 at 12% interest. Such loan was renewed or extended multiple times. Attebury testified

---

[3]Some evidence was adduced that AHF's general partnership interests may be a 1% general partnership interest.

that the purpose of the loan was to cover "soft costs," which he described as costs associated with real estate transactions, such as attorneys' fees, insurance costs, and environmental fees. The loan was secured by partnership interests (not owned by Development) and was guaranteed by AHF and several individuals.

In his testimony, Attebury discussed what he considered when extending credit to Development as well as his theories on lending. He explained that he has a policy against lending to nonprofits because a nonprofit is a "bankruptcy remote entity." He said they are charitable and he equates charity with poverty. He explained his reluctance to get into a situation where he would have to "throw out the poor" in order to foreclose. For these reasons, he insisted the loan be made to Development, not AHF, and that he specifically relied upon Development's separate corporate existence. Regardless of this reliance, the evidence reveals that Attebury knew the loaned funds went to the AHF "enterprise." He testified that he knew he would not be getting repaid from the primary obligor, Development, and, in fact, did not consider Development's financial information prior to making the loan. He did, however, look at and rely on financials of Steve Sterquell, audited financials of AHF, and information from Brown and Graham, AHF's accounting firm. He said the loaned funds were to be used by Development as "enterprise banker" as it saw fit. He believed the borrower should have the discretion to determine the way the money is actually used. Attebury filed proofs of claim for $2,512,315 against both Development as obligor on the note and against AHF as guarantor of the loan.

At the time of its bankruptcy filing, Development had no ongoing business operations. Several years prior, it served as a "qualified intermediary" for "1031 exchanges" in connection with transactions with another asserted creditor, Matt Malouf. The Court understands that such

- 8 -

transactions concerned trades of real property in which funds (several million dollars) evidently flowed through Development. Malouf has filed a proof of claim in the Development bankruptcy case in the approximate amount of $1,000,000. As with many of the claims in these cases, the basis for the claim is anything but clear. Similarly, the Rice Trust has likewise filed a proof of claim in the Development case for "money loans/constructive trusts" in the amount of $2,150,437.09.

There are a total of 30 proofs of claim filed in Development. With the exception of three—Attebury, the Rice Trust, and AHF—all were filed by the Lovell Firm. A review of the claims register reveals that all the Lovell claimants sound their claims in "conversion damages" on the theory that Development wrongfully obtained and converted their funds as they were intended for some other purpose. Each creditor appears to assert against Development a claim for the same amount and respecting the same transaction as claims made in the AHF bankruptcy case. In other words, they are "duplicates" except for the theory upon which the claims are asserted. Many of the creditors have a contract guarantee claim against AHF; they also assert equitable "had and received" theory claims against Development.

## C.

The facts demanding dismissal likewise support, at least in part, the motions for substantive consolidation. The other evidence on the issue of substantive consolidation concerns two expert opinions. Harry Potter (Potter), O'Cheskey's expert, opined that Development and AHF should be substantively consolidated, with all assets and liabilities joined and intercompany receivables, if any, eliminated. William D. Beakley (Beakley), Attebury's expert, disagrees with Potter. Beakley concluded that the intercompany claims, i.e., the $16 million receivable, can be

reconciled without great expense and that it would be improper to consolidate given its effect on Attebury's claim.[4]

Both opinions go to an ultimate issue before the Court and, as such, are not particularly helpful. There are, however, lower level inferences and opinions made by Potter that are helpful and relevant to the issues before the Court.

Potter was originally hired by the AHF Committee to assist them in their many endeavors in the AHF case, including their push for substantive consolidation. Potter is a Certified Forensic Accountant, a Certified Fraud Examiner, and a Certified Public Accountant. He has an accounting degree from the University of Oklahoma and teaches Forensic Accounting and Fraud Investigation at Oklahoma State University. He also has extensive experience in tracing funds; he testified that he "performs investigations into transactions that may not be as they appear on the accounting realm." Potter has testified many times, both in trial and in depositions. He further testified that he has had extensive experience analyzing alter-ego type relationships and thus, in particular, the factual basis and legal criteria giving rise to an alter ego relationship. In fact,

---

[4] Upon his review of several bank statements of AHF and wire transfers between AHF and Development, Beakley concluded that there "appears to be adequate third party documentation to trace the intercompany flow of funds from financial institutions." Respondent's Exhibit 1, p.3. He concluded that "the separate nature of the two legal entities has been recognized and acknowledged by regulatory authorities, independent auditors and certain of the Movants (as reflected by their charitable gifts to AHF and payments made to [Development] for certain investments)." *Id*. at p.4. He thus opines that consolidation would be improper because it would harm creditors of Development. The Court agrees that consolidation prejudices creditors of Development if Development has assets. The Court finds, however, that Beakley's conclusion that the intercompany claims can be readily determined is naive. Upon cross-examination, Beakley was perplexed by, for example, the prospect of an investor ostensibly investing in an AHF-related entity (not Development), making the investment via check payable to the related entity but delivered to Sterquell, who in turn placed the funds in Development's account, only to have funds from Development's account (perhaps the same funds from tracing principles) directed to AHF. AHF has over 65 related entities. Multiple claims as among the various entities potentially exist as a result of this practice. Even assuming that a legal theory exists by which Development is deemed to be owner of the funds that passed through its account, it is inconceivable to conclude that intercompany claims can be reconciled.

Potter's conclusion that Development and AHF should be substantively consolidated is premised upon his conclusion that Development and AHF had an alter-ego type relationship.

As stated, the Court does not look to Potter's ultimate opinion that substantive consolidation is proper. But, in reaching such conclusion, Potter made other inferences and arrived at other sublevel opinions that the Court does rely upon. In particular, Potter concluded that AHF and Development were dominated by Steve Sterquell and that their financial affairs are hopelessly entangled; that AHF and Development, because of Steve Sterquell, failed to follow recognized corporate formalities. Potter concluded Development was a sham in the sense that developers' funds were placed into a bank account owned by Development and thus contrary to investors' understanding that such funds were to be used for one of AHF's projects. Of particular relevance is Potter's conclusion that the aforementioned $16 million receivable cannot be supported and that Development was really nothing more than a bank account (or an entity whose only function was to have a bank account) that was used by Steve Sterquell in his various dealings with investors.

In performing his analysis and in preparing his opinions, Potter relied upon backup factual information obtained from conversations had with lawyers involved in the case; employees of AHF; various documents, including tax returns of AHF and Development; bookkeeping entries made in Quickbooks and spreadsheets; third party documents; and IRS tax

audits.[5]

---

[5]Potter reviewed and relied upon Exhibits 1 - 15 and 17 - 19, all of which were admitted into evidence at the hearing, and are briefly described as follows: Exhibit 1 - Development's Ownership Chart; Exhibit 2 - Development's

Potter concluded that Development and AHF were effectively one entity and should be consolidated. He testified that the books and records of each entity were in terrible condition, that there was massive commingling of funds, and that the accounting practices were "unusual" at best. He testified that reconciling several thousand transfers would be time consuming, expensive, and essentially impossible. He explained the reconciliation process requires that one look at the substance of a transaction over its form. That is to say, one must look beyond merely the recording of debits and credits in a transaction and analyze the purpose of a transfer in order to accord it proper characterization. According to Potter, there were basically four purposes for the funds transferred into Development and that were subsequently transferred out of Development. The funds went back to AHF, to Steve Sterquell personally, to pay bills on behalf of AHF, or for "Ponzi"-like payments to investors in the AHF enterprise. Potter concluded that Sterquell was carrying-on a Ponzi scheme; Potter defined a Ponzi scheme as a "phony investment plan in which monies paid by later investors are used to pay artificially high returns to the initial investors, with the goal of attracting more investors." Trustee's Exhibit 17.

As stated above, Potter's opinion that the entities should be consolidated stem from an alter ego/veil-piercing assessment. His analysis looks to the commingling of funds, the lack of business purpose of Development, and the control of Development by the same individual

---

Partnership Agreement and Amendment; Exhibit 3 - Development's 2006 Partnership Tax Return; Exhibit 4 - Excerpt from Maurice Schooler's deposition; Exhibit 5 - Michelle Abdoo's testimony from April 28, 2010; Exhibit 6 - Chart summary of 2004 to 2009 gross deposits and transfers from Development; Exhibit 7 - Example of flow of funds into Development's bank account; Exhibit 8 - Chart of payee vs. intended actual recipient of "soft money" funds; Exhibit 9 - AHF's claims register; Exhibit 10 - Development's claims register; Exhibit 11 - Robert Templeton's proof of claim filed in AHF; Exhibit 12 - Chart summary of Mays Trusts' ranch sale proceeds in regard to Development's receivable from AHF; Exhibit 13 - Analysis of unsecured creditors' claims against AHF and Development; Exhibit 14 - AHF petition date vs. Development petition date and "GAP period" transfers; Exhibit 15 - Development's transfers by date; Exhibit 17 - Summary of Potter's findings regarding substantive consolidation; Exhibit 18 - Analysis of benefits vs. harm of substantive consolidation for Development; and Exhibit 19 - excerpt from Attebury's deposition.

(Sterquell) who was controlling AHF. Potter did not, however, analyze the effect of substantive consolidation on creditors; he assumed, in effect, that consolidation benefits the estate as a whole.

## DISCUSSION

### A. DISMISSAL

The UST, the Rice Trust, and Attebury contend the Development bankruptcy case must be dismissed. They argue, and correctly so, that if there is "cause" to dismiss, a court must do so unless it specifically identifies "unusual circumstances" that warrant the continuation of the case. *See* 11 U.S.C. § 1112(b)(1) and (2). It cannot be disputed that there is "cause" to dismiss Development (e.g., unexcused failure to timely satisfy reporting requirements, failure to file tax returns, failure to pay UST fees, inability to reorganize or confirm a plan). The dismissal proponents argue there are no "unusual circumstances" at play here, and therefore dismissal is in the best interest of creditors.

The UST contends that Development is not a real debtor, that it filed without legitimate authority. The proposed consolidation here is akin to consolidating a debtor entity with a non-debtor entity, something the UST says there is no authority in the law to do.[6] Keeping Development in bankruptcy distorts and abuses the purposes of Chapter 11. Along these lines, the dismissal proponents cite the policies underlying Chapter 11. Specifically, they aver that Chapter 11 is designed to encourage financial restructuring, protect assets, effect an equitable distribution scheme for all creditors, and preserve jobs. When these purposes cannot be achieved because there is nothing to reorganize, as in the case at bar, then no "unusual circumstances" exist to

---

[6] The UST is not quite correct. While it does appear to be an open issue in the Fifth Circuit, there is at least some authority in support of consolidating a debtor with a non-debtor entity. *E.g., In re Bonham*, 229 F.3d 750 (9th Cir. 2000).

- 13 -

prevent dismissal. Finally, they assert the parties favoring consolidation have failed to establish a *prima facia* case for consolidation or otherwise meet their burden of proof, that dismissal is in the best interest of the creditors, and dismissal is the simplest and easiest decision for the Court.

The arguments against dismissal boil down to the arguments in favor of consolidation. To recap, they are: consolidation prevents Attebury and other creditors (perhaps the Rice Trust) from receiving a larger return on their claims than other creditors of AHF (which assumes the viability of the $16 million receivable) and it provides an earlier petition date for potential Chapter 5 causes of action.

## B. SUBSTANTIVE CONSOLIDATION

There is no dispute among the parties that grounds exist warranting dismissal of Development's Chapter 11 case. The question is whether substantively consolidating Development with AHF is the better, preferred remedy. The Court will therefore address the meaning of and developed law on substantive consolidation.

1.    Substantive consolidation—generally

Substantive consolidation results in the combination of two or more debtors into a single pool from which the claims of creditors are paid ratably. *See In re Babcock & Wilcox Co.*, 250 F.3d 955, 959 n.5 (5th Cir. 2001) ("it usually results in, *inter alia*, pooling the assets of, and claims against, the two entities; satisfying liabilities from the resultant common fund; eliminating intercompany claims; and combining the creditors of the two companies for purposes of voting on reorganization plans"). No Code provision provides for substantive consolidation; the authority of the court to order substantive consolidation is derived from the equitable powers of the bankruptcy court. *See In re Permian Producers Drilling, Inc.*, 263 B.R. 510, 517 (W.D. Tex.

2000). There is authority for the court to order less than complete consolidation or to limit the effect of the consolidation order. *See In re ASARCO, LLC*, 420 B.R. 314, 369 (S.D. Tex. 2009) (deeming consolidated for the purpose of voting and distribution under parent entity's plan).

Though "[t]here are some justifications for substantive consolidation," courts, particularly in the Fifth Circuit, warn that the power to consolidate is a drastic remedy to be used sparingly. *See In re Pacific Lumber, Co.*, 584 F.3d 229, 249 (5th Cir. 2009) ("Substantive consolidation is an 'extreme and unusual remedy.'") (citing *In re Gandy*, 299 F.3d 489, 499 (5th Cir. 2002)); *see also In re Introgen Therapeutics, Inc.,* 429 B.R. 570, 581 (Bankr. W.D. Tex. 2010) (Gargotta, J.) (citing *In re Amco Ins.,* 444 F.3d 690, 696-97 (5th Cir. 2006)). However, the increased appearance of cases involving numerous interrelated corporate structures and, in particular, subsidiary corporations operating under a parent entity is credited with giving rise to a "liberal" view that allows for consolidation more easily. 1 COLLIER ON BANKRUPTCY ¶ 105.09[1][c] (16th ed. 2010). This liberalization is more prevalent in bankruptcy courts where there is controlling circuit authority upholding substantive consolidation. In any jurisdiction, substantive consolidation is a highly fact-specific analysis made on a case-by-case basis. *See In re Permian Producers*, 263 B.R. at 517.

The lack of a statutory footing for the remedy has undoubtedly contributed to a confused body of case law. *See id.* The courts have failed to articulate a uniform standard for determining whether consolidation is appropriate. There is a wide array of approaches, instead. One court recently applied two. *See In re Introgen Therapeutics*, 429 B.R. at 582-85. The following is a general survey of the methods used.

2.    <u>The tests employed by the courts</u>

a.   _The traditional or factor-based test_

Some courts look to certain "factors" or "elements" in determining the propriety of substantive consolidation. A comprehensive list of elements include the following: the presence or absence of consolidated financial statements; the unity of interests and ownership between the various corporate entities; the existence of parent and intercorporate guaranties on loans; the degree of difficulty in segregating and ascertaining individual assets and liabilities; the transfer of assets without formal observance of corporate formalities; the commingling of assets and business functions; the profitability of consolidation at a single physical location; parent corporation owns all or a majority of the capital stock of the subsidiary; parent and subsidiary have common officers and directors; parent finances subsidiary; parent is responsible for incorporation of subsidiary; subsidiary has grossly inadequate capital; parent pays salaries, expenses, or losses of subsidiary; subsidiary has substantially no business except with parent; subsidiary has essentially no assets except for those conveyed by parent; parent refers to subsidiary as department or division of parent; directors or officers of subsidiary do not act in interests of subsidiary, but take directions from parent; formal legal requirements of the subsidiary as a separate and independent corporation are not observed; the transfer of assets without formal observance of corporate formalities. _See_  1 COLLIER ON BANKRUPTCY ¶ 105.09[2][a] (16th ed. 2010).  No courts use them all, but rather a subset.  For example, the court in _In re Introgen Therapeutics, Inc._ emphasized the first seven.

The weight that should be accorded to any given factor is unclear. What is clear is that no single element or group of elements is determinative to the outcome. At minimum, however, there must be a close relationship between the two entities for consolidation to occur.

Another way courts might authorize substantive consolidation is by applying a corporate veil-piercing analysis. This test overlaps with the elements-based test. *Id.* at ¶ 105.09[2][c]. One court recently delineated the differences between veil-piercing and substantive consolidation, however. *See In re Coleman*, 417 B.R. 712 (Bankr. S.D. Miss. 2009).

    *b.*    <u>The balancing test</u>

Several courts appear to be following a trend of identifying elements from the "traditional test" but then actually apply a balancing test. There are a variety of "balancing tests" to choose from. The following three cases represent the leading methods.

    *i.*    *In re Snider Bros., Inc.*, 18 B.R. 230 (Bankr. D. Mass. 1982). The substantive consolidation analysis boils down to weighing the economic prejudice of separateness versus economic prejudice of consolidation.

    *ii.*    *Eastgroup Properties v. Southern Motel Ass'n, Ltd.*, 935 F.2d 245 (11th Cir. 1991). The court balances "whether consolidation is necessary to avoid some harm or realize some benefit."

    *iii.*    *In re Augie/Restivo Baking Co., Ltd.*, 860 F.2d 515 (2d Cir. 1988). A court looks to the reliance of the creditor to evaluate (1) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity when extending credit, or (2) whether the affairs of the debtor are so entangled that consolidation benefits all creditors.[7]

It appears that applying some variant of a balancing test is the trend. Courts are frequently reciting and considering the factors listed above and then grafting on a few more factors (those required to be "balanced" from *Snider*, *Eastgroup*, or *Augie/Restivo*) and giving the latter more weight.

    *c.*    <u>Other various methods</u>

---

[7] This test was adopted by the court in *In re Introgen Therapeutics*, 429 B.R. at 583. This opinion is the most recent and includes a comprehensive analysis. This is also the test used by the court in *In re Mortgage Investment Co.*, 111 B.R. 604 (Bankr. W.D. Tex. 1990).

- 17 -

Although technically only a single factor to consider under the "traditional test," some courts have ordered consolidation when the record shows the entities are so hopelessly intertwined that sorting them out would cause prejudice to all. The degree of entanglement and prejudice required, however, varies. At least one case from the Northern District of Texas has held that even very substantial costs associated with untangling entities is not enough to support consolidation when the consolidation would prejudice some creditors. *See In re DRW Property Co. 82*, 54 B.R. 489 (Bankr. N.D. Tex. 1985);[8] but *see Introgen Therapeutics*, 429 B.R. at 583 (stating that "some intercompany accounts and commingling" is sufficient to support substantive consolidation since "it would not necessarily be easy to separate the accounting.").

Finally, it can be argued that consolidation is justified if requested, it appears beneficial, and no one objects. Arguably no one is prejudiced if no one objects. *See In re Coleman*, 417 B.R. at 718-19. ("The Consolidation Motion was duly noticed to the IRS, all creditors, and parties-in-interest. . . Neither the IRS nor any other creditor filed an objection to the relief requested. . . . On May 4, 2007, this Court entered an Order Granting Motion for Substantive Consolidation.").

3.    The effect of consolidation

Substantive consolidation has the effect of eliminating duplicative claims filed against related debtors by creditors uncertain as to where the liability should be allocated. *In re DRW Property*, 54 B.R. at 494. Almost all substantive consolidations will cause prejudice to some creditors of at least one of the entities. *Id.* ("It must be recognized and affirmatively stated that substantive consolidation, in almost all instances, threatens to prejudice the rights of creditors.

---

[8]In this case, the U.S. Trustee objected, and the court indicated its concern with the "'Braniff' Question" – that is, whether it would be proper for the court to order consolidation outside of the plan. Though not essential to the holding of the case, the court indicated that consolidation was only properly considered within a plan. Cases have been consolidated outside the plan process, however.

This is so because separate debtors will almost always have different ratios of assets to liabilities. Thus, the creditors of a debtor whose asset-to-liability ratio is higher than that of its affiliated debtor must lose to the extent that the asset-to-liability ratio of the merged estates will be lower.") (internal citation omitted); *see also In re Bonham*, 229 F.3d at 762 ("Consolidation 'almost invariably redistributes wealth among the creditors of the various entities' because the consolidated entities are likely to have different debt-to-asset ratios.") (citing *Eastgroup*, 935 F.2d at 248).

The standard for measuring the prejudice to creditors is also unclear.[9] For example, some argue for an objective standard that compares the projected effect of consolidation with the likely result without consolidation. *See* 1 COLLIER ON BANKRUPTCY ¶ 105.09[2][d][iii] (16th ed. 2010). A subjective standard looks instead to the creditor's subjective expectations at the time the credit was extended based on its reliance on the separate credit of the debtors. *Id.* This evaluation is obviously related (and sometimes conflated) with the *Augie/Restivo* balancing test discussed above. Others apply a blend of the two methods. *Id.* Some courts require that consolidation can cause distributional benefits (a greater number of creditors benefit). *Id.* Some require a net benefit for *all* creditors. *Id.* Others consider how consolidation may enhance the reorganization. *Id.* For example, if the consolidation would mean one plan and would eliminate potential intercompany issues, it might be ordered. *Id.*

Substantive consolidation should not affect a validly perfected lien. If a lien is affected, then consolidation should not be ordered. *In re Gulfco Inv. Corp.*, 593 F.2d 921 (10th Cir. 1979). Similarly, the governing periods on avoidance actions may be affected by a consolidation order.

---

[9]The UST argues that one *cannot* ever adequately quantify a creditor's right in this regard.

*See In re Baker & Getty Fin. Servs., Inc.*, 88 B.R. 792 (Bankr. N.D. Ohio 1988). (An insider of one of the consolidated debtors was not considered an insider of all consolidated debtors, at least in the absence of a finding in the consolidation order that the debtor constituted a single enterprise.) There are other cases that used the pursuit of preference and fraudulent transfer actions as grounds justifying substantive consolidation. *In re Bonham*, 229 F.3d at 764-65; *see also In re Auto-Train*, 810 F.2d 270, 275-77 (D.C. Cir. 1987).

4.      Burdens, standard of review, and appealability

The parties seeking consolidation bear the burden of proving that any prejudice resulting from consolidation is outweighed by the greater prejudice posed by the continued separation of the estates, according to the only case addressing the point from the Northern District of Texas. *See DRW Property*, 54 B.R. at 495. A necessary corollary, according to *DRW*, is for the party seeking consolidation to also show prejudice to the estates if they were to remain separate. *Id.* (citing *In re Donut Queen*). One court within the Fifth Circuit has stated the proponent of substantive consolidation must carry its burden by a preponderance of the evidence. *Introgen Therapeutics*, 429 B.R. at 582.

Though a bankruptcy court's decision to order consolidation is reviewed for abuse of discretion, the underlying findings of fact supporting that decision will be set aside only if "clearly erroneous." *Permian Producers*, 263 B.R. at 519. A bankruptcy court's determination of whether to issue an order *nunc pro tunc* is reviewed for abuse of discretion or erroneous application of the law. *In re Bonham*, 229 F.3d at 762. An order of substantive consolidation is final and appealable. *Id.*

5.      Fifth Circuit case summaries

- 20 -

The Court is especially mindful, as it should be, of the Fifth Circuit's admonitions concerning the application of substantive consolidation. In *In re Amco Ins.*, 444 F.3d 690 (5th Cir. 2006), the Fifth Circuit reviewed the bankruptcy court's order granting a trustee's motion for substantive consolidation. The court vacated the order as an abuse of discretion. *Id.* at 697. In *Amco*, an individual named Peerbhai controlled two entities that were involved in the insurance business, AIG and AIA. *Id.* at 692. Peerbhai and AIG obtained financing from Wells Fargo in 2000. *Id.* By 2001, the parties breached the loan agreement with Wells Fargo and were sued in state court. *Id.* Shortly thereafter, AIG and AIA filed bankruptcy, but Peerbhai did not. *Id.* Wells Fargo was able to continue its collection efforts against Peerbhai individually since he had not filed. *Id.* An agreed lift stay order was entered in the bankruptcy cases (apparently with the agreement of the trustee) so that Wells Fargo could continue the state court litigation—and for practical purposes, negotiate a settlement agreement with all three entities. *Id.* This settlement agreement was ultimately reached in April 2002, leaving Peerbhai indebted to Wells Fargo for $3,398,956.16. *Id.* at 692-93.

In July of that year, the trustee for AIA filed a motion for substantive consolidation, seeking to consolidate AIA and Peerbhai as a single debtor in bankruptcy. *Id.* at 693. After two days of evidence, the bankruptcy court was convinced Peerbhai concealed assets from his creditors, commingled funds, that there was a substantial identity between the entities, creditors relied on them as a single unit, and they did not observe corporate formalities. *Id.* The bankruptcy court ordered consolidation. *Id.* The order was given *nunc pro tunc* treatment. That is, the entities (the non-debtor individual and the two debtors) were to be considered consolidated from the date

- 21 -

of the petition "because at all relevant times, Peerbhai and AIA operated as one financial entity." *Id.*

The Fifth Circuit was concerned that the bankruptcy court gave a "green light" to Wells Fargo when it lifted the stay. *Id.* at 695. Wells Fargo "expended its time and money to pursue the state court litigation" in reliance on this supposed nod from the bankruptcy court. *Id.* It was unfair that Wells Fargo had negotiated a settlement only to have it undone by the bankruptcy court. *Id.*

The court noted that though the bankruptcy court is a court of equity, its equitable powers are not limitless and that it went too far by leading Wells Fargo down a path it later effectively revoked. *Id.* Since the court held the bankruptcy court erred by allowing substantive consolidation *nunc pro tunc*, it declined to address Wells Fargo's argument regarding the bankruptcy court's power under Section 105 to grant substantive consolidation and, if such power exists, the proper standard to use in applying substantive consolidation. *Id.* at 695, 697. The court stated, however, that "those jurisdictions that have allowed it emphasize that substantive consolidation should be used 'sparingly.'" *Id.* at n.5. Because "substantive consolidation affects the substantive rights of parties" it is "subject to heightened judicial scrutiny." *Id.* at 695.

In *In re Pacific Lumber*, it was alleged that the plan of reorganization effected substantive consolidation. The panel there held that the plan did not substantively consolidate the debtor entities. In doing so, it acknowledged the existence of substantive consolidation and did not question the authority of the bankruptcy court to order such remedy. *In re Pacific Lumber*, 584 F.3d at 249 ("There are some justifications for substantive consolidation . . . .").

## C. THE CHOICE

- 22 -

As stated at the outset, the Court is faced with the choice of either dismissing this bankruptcy case or, in effect, folding it into the AHF case through substantive consolidation. As a general rule, dismissal is mandated if "cause" for dismissal is established. 11 U.S.C. § 1112 (b)(1). Such cause has been established here. *See* § 1112(b)(4) (identifying grounds that constitute cause). Dismissal is not proper, however, if "unusual circumstances" exist establishing that dismissal is not in the best interest of creditors and the estate, "and the debtor or any other party in interest establishes that . . . there is a reasonable likelihood that a plan" will be timely confirmed. § 1112 (b)(2)(A).[10] The unusual circumstances here are the perceived benefits to be derived from substantively consolidating Development with AHF. These two cases meet many of the elements that some courts look to for substantive consolidation. There are also benefits to be derived, especially from the viewpoint of the proponents of substantive consolidation. For example, consolidation is an easy way to dispose of the $16 million receivable.

So, the Court is being asked to forego the statutorily mandated remedy of dismissal in favor of the equitable remedy of substantive consolidation. Should the Court tolerate a filing made without any intention or ability to comply with the Bankruptcy Code? The Code requires dismissal of such a case and, indeed, requires dismissal long before dismissal can here occur. *See* 11 U.S.C. § 1112(b)(3) (The bankruptcy court must commence a hearing under this subsection not later than 30 days after a filing of the motion and shall decide the motion within 15 days after commencement of the hearing). AHF filed Development's Chapter 11 to prevent Attebury from obtaining a judgment against Development. Then the "plan" for Development was to use the

---

[10]The statute further provides that for the "unusual circumstances" exception to apply, the grounds for dismissal must *not* be among those identified at § 1112(b)(4). As set forth above, this case obviously satisfies several of the grounds of subsection (b)(4).

bankruptcy as a means to effect substantive consolidation. As outlined above, substantive

consolidation is a somewhat ill-defined, non-uniform equitable remedy that, apart from section

105 of the Code, is not moored to the Code. It is to be used sparingly. It is also a remedy that

bankruptcy courts *may* employ.  Dismissal is the required remedy here.

In addition, the perceived benefits of substantive consolidation are overstated. The two

specific benefits here are that (1) it eliminates the claimed $16 million receivable, and (2) it creates

an earlier date—the AHF filing date—for potential preference and fraudulent transfer claims. The

applicability here of the broadly stated benefit of substantive consolidation—the combining of two

viable debtor entities and thus the pooling of assets and claims as a means to ensure such claims

are paid ratably—is premised upon the existence of the $16 million receivable. Without the

receivable, Development has no assets and combining the two estates serves no real purpose. The

other stated benefit, the use of the AHF filing date for preference and fraudulent transfer claims,

assumes such "benefit" is a proper use of substantive consolidation.

First, as for the $16 million receivable, the Court is satisfied that its viability is nil. In the

few years prior to the bankruptcy filing, Development conducted no business operations and

provided no goods or services from which a receivable can arise. Potter concluded that in excess

of $140 million passed through Development. It is naive to conclude that some discreet amount

represents a receivable held by Development simply because a portion of the funds were

ultimately spent by AHF in some fashion. The Court accepts Potter's basic conclusion that

Development was nothing more than a conduit bank account. The Court likewise accepts Potter's

assessment that unraveling the funds that passed through Development is impossible. In addition,

it is unclear who, besides Attebury, recognizes the existence of the receivable. O'Cheskey, the

Trustee of AHF and thus the one standing in AHF's shoes, does not. Obviously Development—through AHF (now O'Cheskey) as general partner of Development—does not acknowledge the validity of the receivable. On the other hand, Attebury's claim is purely tactical. He simply wants to maintain his separate claim against Development as a way to preserve any potential recovery from Development. After Development's dismissal, the question of how Attebury's claim plays out is pure conjecture. But his pursuit of a claim against Development is, in the Court's view, a waste of personal resources.

Second, as for the articulated benefit of using AHF's filing date, the Court questions the fairness of permitting such result. As the parties know, the AHF filing date is the date of the AHF *involuntary* filing, as a result of the agreed consolidation of the AHF voluntary case into the AHF involuntary case. The Court approved such agreement, recognizing that had AHF simply agreed to relief in the involuntary case, the filing date would have been the date of the involuntary filing.[11] If as a result of substantively consolidating AHF with Development, the Court were to allow the AHF involuntary filing date to control, the filing date for potential avoidance claims will have, in effect, been backdated two times—first, from Development's filing date to AHF's voluntary filing date, and then from AHF's voluntary filing date to its involuntary filing date. While avoidance actions serve the Code's policy of effecting a ratable and equitable distribution scheme, using them as proposed here with AHF's filing date is unfair and inequitable. Besides, given the manner in which Development was used by Sterquell (and arguably AHF), such potential avoidance actions may lie with AHF.

---

[11]The AHF case began by an involuntary petition filed April 21, 2009. AHF, as a non-profit entity, initially opposed the involuntary. It then filed its voluntary petition (to avoid potential issues associated with a non-profit entity consenting to relief in the involuntary action) on June 11, 2009. The two cases were consolidated with the filing of the involuntary case constituting the filing date for the consolidated cases.

Finally, while the Court is not prepared to conclude that substantive consolidation must benefit all creditors before directed, it is satisfied that Attebury has a substantial claim against both Development and AHF and, as such, is entitled to pursue such claim against both AHF and Development. Though the Court believes his pursuit of his claim against Development is pointless, the ultimate result of such endeavor is somewhat hypothetical.  Attebury is of the opinion that he is harmed by substantive consolidation and, under the circumstances, such opinion should be recognized.

The Court will enter its order dismissing this case.

### End of Memorandum Opinion ###